**WARNOCK, MACKINLAY & CARMAN, PLLC**
246 South Cortez Street
Prescott, Arizona 86303
Tel: (928) 445-8056
Fax: (928) 445-8046
Email: kcarman@lawwmc.com
Krista M. Carman (Bar No. 021700)
John T. White (Bar No. 022091)
Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| TERRI WOODMANSEE, an individual, <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF GOODYEAR, a body politic; MARK BROWN, Chief of the City of Goodyear Police Department and JANE DOE BROWN, husband and wife; COMMANDER RALPH MCLAUGHLIN and JANE DOE MCLAUGHLIN, husband and wife; LIEUTENANT BILL CUSSON and JANE DOE CUSSON, husband and wife, <br><br> Defendants. | No. CV 09-01994-PHX-ROS <br><br> **PLAINTIFF'S RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT RE "PROTECTED ACTIVITY" OF HER WHISTLEBLOWING CLAIMS** <br><br> (Assigned to the Honorable Helen W. Gillmor) <br><br> (Oral Argument Requested) |

Plaintiff, Terri Woodmansee, hereby files her Renewed Motion for Partial Summary Judgment. As the Court will recall, in May 2011, the Court granted Plaintiff's Emergency Motion for Leave to Conduct Limited Additional Discovery and Supplement Summary Judgment Briefing Re Newly Released City Investigation Report, finding "good cause" to reopen discovery regarding the scope of the City Defendants' knowledge at the time of Plaintiff's termination, the apparent disparate treatment of Plaintiff with respect to termination in comparison to other employees, and other

relevant matters arising out of the City's investigative report authored by Paul Charlton (the "Charlton Report"). [Dk. # 147.] At that time, the Court also denied without prejudice (*inter alia*) Plaintiff's then-pending Motion for Partial Summary Judgment, allowing for Plaintiff to refile her Motion following the completion of the additional discovery. [*Id.*] The parties have now completed that discovery.

For the reasons set forth herein, Plaintiff respectfully requests that the Court grant her partial summary judgment in her favor on the "protected activity" element of her claims that she was wrongfully and unlawfully terminated by Defendants in retaliation for her whistleblowing, in violation of her right to protected and free speech, pursuant to the First Amendment via 42 U.S.C. § 1983 and pursuant to the Arizona Employment Protection Act ("AEPA").

Under both federal and state law, Plaintiff must prove (among other elements) that she engaged in "protected activity," that is, that the speech or conduct at issues was "protected" (*e.g.,* that it falls within the ambit of the First Amendment) and that the protected speech was a substantial or motivating factor in the alleged retaliatory action. *See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (2001); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). The first factor, whether the speech was "protected," is a question of law for this Court. *See id.*

As explained below, here, Plaintiff was an employee of the City of Goodyear Police Department, who was terminated after stepping forward and reporting to a representative of the Maricopa County Attorney's Office ("MCAO") that she had serious concerns about the way her PD was handling a death investigation that involved one of the PD's own officers. There is no remaining dispute of fact on the issue of whether she was engaged in protected speech by making her report to the MCAO: She did so not out of a job duty requirement, but out of concern and a desire that someone

outside her department look into her concerns, concerns that were critical of Defendants. And she did so for good reason and with a reasonable belief; in fact, recent discovery has revealed that Defendants *own* investigator concluded that there were significant anomalies with the investigation that lends credence to the belief of a conspiracy, evidence that officers within the PD acted to protect one of their own, and evidence that Plaintiff was terminated, while others who violated policy in connection with the investigation were either never disciplined or given minor discipline years after the fact and only *after* the recent revelation of the City's own Charlton Report.

Thus, Plaintiff has met her burden with respect to this portion of her claim. She had a reasonable belief that there were violations of law and that she disclosed her belief in a reasonable manner to someone that she believed had the authority to investigate. *See Levine v. TERROS, Inc.*, 2010 WL 864498, *9 (D. Ariz. 2010). Defendants, by their own admissions as set forth in deposition testimony and affirmed by the Charlton Report, have conceded that Plaintiff's belief that an illegal conspiracy and cover up existed was reasonable under the circumstances and in light of the information she had learned. And Plaintiff reported her concerns to a friend at the Maricopa County Attorneys' Office ("MCAO"), who she believed could help carry out her statement that this matter be investigated by an outside agency.[1]

As a result, there is no dispute on that element of Plaintiff's claim left for trial. She engaged in "protected activity," which led to her termination, while others who participated in the misconduct Terri reported and that was affirmed by the Charlton Report received only minor reprimands and *only* after the Charlton Report was revealed three years later.

Accordingly, for the reasons set forth herein, Plaintiff respectfully requests that

---

[1] In fact, Ms. Mayberry would later confirm that her boss at the MCAO would look into it.

3

the Court grant her partial summary judgment in her favor with respect to the issue of whether her conduct in making a report to the MCAO was a "protected activity" within the meaning of the First Amendment and the AEPA.

This Motion is supported by the attached Memorandum of Points and Authorities, Plaintiff's Separate Statement of Facts in Support hereof ("PSSOF") (filed concurrently herewith), the exhibits thereto, and the pleading and documents on file with the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND.

### A. Summary of the Case.

Plaintiff, Terri Woodmansee, was employed by the City of Goodyear as a victim's services coordinator which is a civilian position within the Goodyear Police Department. [PSSOF ¶ 1.] Specifically, Plaintiff created and was the director of the Crisis Services Department. [*Id.* ¶ 2.] At all material times, her superiors included Mark Brown, Chief of Police, Ralph McLaughlin, Commander, and Bill Cusson, Lieutenant. [*Id.* ¶ 3.] Plaintiff was employed for nine (9) years with the Department and received positive job reviews. [*Id.* ¶ 4.]

In or about April 2008, Plaintiff was asked by the Department to assist in a death notification matter involving the death of a young man named Jered Pendleton. [*Id.* ¶ 5.] As she assisted the victims in this specific case, she became concerned as information she learned and observed during the course of her work led her to believe that an officer or officers of the Department were violating Department policies and City and State laws. [*Id.* ¶ 6.] She first addressed her concerns through the Assistant to the Chief of Police, John Rowan, her boyfriend at the time. [*Id.* ¶ 7.] But, not only did those attempts fail to resolve her concerns, her concerns grew and she came to believe

whole-heartedly that there might be a widespread cover-up within the Department to sweep under the rug any evidence that one of its own officers may have hit and struck the victim, Jered Pendleton, with his police car. [*Id.* ¶ 8.]

As a result of her concerns, Plaintiff confided in the Chief of the Maricopa County Attorney's Victim's Services Department, Jamie Mabery. [*Id.* ¶ 9.] Specifically, Plaintiff relayed that she had heard statements that indicated an officer had potentially destroyed evidence related to a hit and run victim; that the officer may have been involved in the hit and run collision killing the young man; and that there was an effort by the Department to conceal these matters from the public and the victim's family. [*Id.* ¶ 10.] At her deposition in this case, Terri explained that she had approximately seven (7) bases for approaching the MCAO:

1. No detectives were assigned to the case which was Departmental policy whenever there was a potential homicide.
2. Terri was instructed to have no further contact with Jered Pendleton's family to provide victim services which had never occurred in any other case Terri had worked on.
3. The initial police report in the Pendleton case made no mention of detective involvement which was very odd for a "body in the roadway" case.
4. Terri overheard Officer Bill Will state that command staff allowed the alleged officer involved in Jered's death take his police car home and wash it.
5. Terri overheard Officer Jeff Rogers state that the police car involved was found to have a foot or finger print on it. She found it odd that this was not in the police report nor was it mentioned that an officer could possibly be involved.
6. Tempe Police officers were overheard speaking with Officer Jeff Rogers about the police car involved and were speaking about taking blood samples found on the vehicle.
7. The supplemental report by the officer alleged to be involved did mention that he hit something in the road but he did not look back to see what it was. It was odd that this was added after the initial report.

[*Id.* ¶¶ 11-12.]

The information Terri relayed to Mabery outlined her concerns that an officer within the department was violating state and city law as well as departmental policies.

5

Mabery was employed with the Maricopa County Attorney's Office. [*Id.* ¶ 13.] Mabery told Plaintiff that the County would look into the information and told her to deny it was she who blew the whistle if she was asked by the Department.[2] [*Id.* ¶ 14.] Mabery assured Terri that the County would not reveal her identity. [*Id.*]

Mabery then relayed Terri's concerns to her supervisor. Eventually the City of Goodyear Police Department management was informed of Terri's concerns by the police liaison at the County Attorney's Office. [*Id.* ¶ 15.] As a result of Terri's whistleblowing, an internal affairs investigation was opened to investigate whether or not Terri had been the one to make the disclosure and, if so, what were her sources or bases. [*Id.* ¶ 16.]

Terri was placed on administrative leave by Defendant Cusson for "possible violations of City policies." Terri cooperated in the investigation; but, when asked if she was the one who blew the whistle she initially denied it, as she stated she had been advised to do by Mabery in order to "protect herself." [*Id.* ¶ 17.] Terri believed that her identity was protected as a whistleblower.

The Department did not believe her denial. Even its own investigator, Mr. Humphrey, wrote in his report that he knew she was attempting to conceal her identity and that he could see how a reasonable person in her shoes would believe there was a conspiracy. [*Id.* ¶ 18.] Mr. Humphrey recommended that further investigation into the reasons for her concerns be conducted, including interviewing other department employees. [*Id.* ¶ 19.] No such investigation ever occurred. [*Id.* ¶ 20.]

Shortly after Mr. Humphrey issued his report, Terri was called into the Chief's office in a pre-termination meeting, where she confessed that it was she that had made

---

[2] Terri Woodmansee has testified that Jaime Mabery told her to deny that she blew the whistle, if asked by Goodyear. However, when deposed Ms. Mabery testified that she did not recall telling Terri to deny that she was the whistleblower.

the report to the MCAO. [*Id.* ¶ 21.] It did not matter. Terri's termination was a forgone conclusion and her concerns simply tossed aside and never addressed.

Terri was officially terminated on August 8, 2008, by Defendant Brown based on the recommendation of Defendant McLaughlin that she be terminated because she "gossiped" about the Department and failed to display "absolute honesty." Terri appealed her termination and a hearing was held, the result of which would be to affirm her termination. [*See id.* ¶ 22.]

### B. The Protected Activity.

The information she observed, heard, and read, led Terri to believe that there were unlawful activities occurring (or that had occurred) with respect to Officer Hardin's involvement in the Pendleton incident and a subsequent cover up by the Goodyear Police Department. Her concerns led first to her raising questions with the Assistant to the Chief, John Rowan. [*Id.* ¶ 23.] When those concerns could not be answered – even by the Chief's assistant's own inquiries – she did some investigation on her own, even reviewing a draft of the lead investigator's report. That draft did not mention any potential officer involvement. [*Id.* ¶ 24.]

The information Terri saw, heard, and read compelled her to seek out Ms. Mayberry's assistance. She knew Ms. Mayberry from her involvement in other professional associations. She also knew Ms. Mayberry worked for a prosecuting agency of law enforcement: The Maricopa County Attorney's Office. [*Id.* ¶ 25.] Terri explained in her deposition that she made the report to Ms. Mayberry because she knew Ms. Mayberry would be able to help her, since she worked for the County Attorney's Office, and that she told Ms. Mayberry that an "outside agency needs to look at it." [*Id.* ¶ 26.]

Defendants' outside investigator, Jim Humphrey, who was hired to conduct the

7

internal affairs investigation on Terri, reported that Terri's concerns were reasonable in light of what she likely heard, read, and observed: "Any normal thinking person would not make up from nothing all the details that Terri told Mayberry . . . . someone might naturally think that the blood [found on Officer Hardin's car] may have belonged to Pendleton . . ." [*Id.* ¶ 27.] Commander McLaughlin, who was in charge of the internal investigation into Terri confirmed that it was understandable for Terri to draw the conclusions she did based on the "red flags" she identified and that it was "reasonable" for her to take those concerns to the Maricopa County Attorney's Office. [*Id.* ¶ 28.] Chief of Police, Mark Brown, agreed. [*Id.* ¶ 29.] He testified that it was reasonable for Terri to have her suspicions based on what she had seen, observed, and understood about the Pendleton case. [*Id.*] And, he explained, a police cover-up would give rise to criminal issues. [*Id.* ¶ 30.]

Despite the reasonableness of her suspicions, Defendants never followed up on any of the information or concerns Terri had about the Pendleton investigation. [*Id.* ¶ 31.] Even their own investigator, Jim Humphrey, admitted in his deposition that the second part of the investigation was supposed to uncover the source of Terri's concerns, but that he was told to simply stop after Terri initially denied being the individual who made the report. [*Id.* ¶ 32.] John Rowan, the Assistant to the Chief of Police, also confirmed that Terri's suspicions were, in his opinion, justified. [*Id.* ¶ 33.] He testified at his deposition – in response to questioning from the City's own attorney – that he believed Terri's termination was an "injustice," based on his own observations and investigations that led to his own concerns about the Pendleton investigation. [*Id*.] In compelling fashion in his deposition, he carefully and specifically identified his own bases for drawing conclusions similar to Terri and those conversations he shared with her about some of them, further evincing the reasonableness of Terri's decision to

bravely step forward and report her concerns to her friend at the Maricopa County Attorneys' Office, a decision which ultimately led to her termination. [*See id.* ¶ 34.]

Tellingly, in March 2011, the press released an internal report by former U.S. Attorney, Paul Charlton, who the City retained to conduct an internal investigation into the bases of Terri's concerns following some deposition testimony in this case from the assistant to the chief of police, John Rowan. [*Id.* ¶ 35.] The Charlton report notes that the officer Terri was concerned about, Brad Hardin, had immediately reported to his superiors that he believed he might have struck and killed an 18-year-old boy. [*Id.* ¶ 36.] The report further confirmed many of the bases that caused Plaintiff to make her report to the MCAO, even noting that the number of inexplicable anomalies in the investigation lends credence to the notion that there might have been a conspiracy. [*Id.* ¶ 37.] Mr. Charlton concluded that several officers had acted to "protect one of their own" in the handling of the investigation, noting that the supervisors who were told by Hardin that he might have struck and killed someone had never included that information in any written report. [*Id.* ¶ 38.] Despite that (among many other anomalies that appear to violate policy), Mr. Charlton noted that as of March 2011, none of the officers had been reprimanded or disciplined in any way. [*Id.* ¶ 39.]

Defendants were questioned about that a few months ago at their continued deposition. As it turns out, at the time they were evaluating and considering Terri's disclosure to the MCAO, Defendants were well aware of the potential involvement of one of their own in the investigation. [*Id.* ¶ 40.] Defendants knew, therefore, that there was a reasonable basis for Terri's concerns; rather than address those, they simply terminated her, even though she ultimately admitted to them during the investigation that she made the disclosure. [*Id.* ¶ 41.]

Although a few of the officers involved in the investigation have received minor

9

reprimands since the Charlton Report (now more than three years later), none were fired. [*Id.* ¶ 42.] Instead, a couple of officers were given a letter of instruction in their files and the supervisor who failed to write any report about his inspection of the vehicle of an officer who came to him that night, admitted hitting something, and told him he thought he might have struck and killed a kid, got a day off without pay. [*Id.* ¶ 43.] There can be little doubt that Terri was treated differently because of her whistleblowing activities, because of engaging in protected activity.

## II. ARGUMENT.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate on each claim or defense or any "part of each claim or defense" if the moving party shows that there are no genuine disputes of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). By this Motion, Plaintiff seeks partial summary judgment in her favor on only one part of her claims of retaliation for whistleblowing, under both federal and state law.

The Constitution does not protect all speech made by an employee; rather, its Under both the First Amendment and AEPA, Plaintiff must establish (among other elements) that she engaged in "protected activity," that is, that she indeed made a report or disclosure contemplated within the meaning of the acts. *See, e.g., Hernandez*, 343 F.3d at 1113. There are many types of "protected" disclosures, including (*inter alia*) an "abuse of authority, a substantial and specific danger to public health or safety, or a violation of law, rule or regulation." *See, e.g.,* AEPA, A.R.S. § 23-1501(c)(ii) (defining whistleblowing to include disclosure of information that the employer has violated, is violating, or will violate applicable laws).

Thus, to constitute a "protected activity" under both acts, Plaintiff must establish that she had a reasonable belief that there were violations of law and that she disclosed

10

her belief in a reasonable manner to someone that she believed had the authority to investigate. *See Levine*, 2010 WL 864498 at *9. Indeed, the case law with respect to the federal whistleblower act is instructive in that regard, since others, like John Rowan, shared Plaintiff's concerns and suspicions about Defendants' conduct. *See, e.g., Chambers v. Dept. of Interior*, 602 F.3d 1370, 1379, n.7 (Fed. Cir. 2010) (quoting *Lachance*, 174 F.3d at 1381) ("The test for determining whether an employee had a reasonable belief that her disclosures evidenced misconduct under the WPA is whether „a disinterested observer with knowledge of the essential facts known to and readily ascertainable by the employee could reasonably conclude that the actions of the government evidence wrongdoing. . . .").

Here, there is no genuine dispute of fact on this element of Plaintiff's retaliation and whistleblowing claims. Terri's suspicions were objectively reasonable in light of the "essential facts known to and readily ascertainable" by her. *See id.* For example, she learned that no detectives had been assigned to the Pendleton death case. [PSSOF ¶ 12.] She was the victim's advocate who helped locate the family of Jared Pendleton, only to later be instructed to have no further contact with his family. [*Id.*] She overheard Officer Bill Will state that Officer Hardin had been told to take his police car home and wash it, after having been reported passing by the intersection where Jared Pendleton's body was found only a minute before. [*Id.*] She overheard the lead investigator state that the police car involved was found to have a foot or finger print on it and that blood samples had been taken from the vehicle. [*Id.*] And, yet, the draft report on the police system she initially reviewed made no mention of any such matters or officer involvement. [*Id.*] When she reviewed a later draft of the report, Officer Hardin reported having hit something in the road that evening, but did not look back to investigate what he had struck with his vehicle moments before. [*Id.*] Terri found it

11

odd that such information had not been included in the initial draft of the report.

Terri was not alone in her concerns. John Rowan, was a decorated law enforcement veteran and the assistant to the Goodyear Chief of Police. She reported her concerns about the Pendleton investigation to him and he did his own inquiries, sharing some results with her. [*Id.* ¶¶ 33-34.] Ultimately, he would write that Terri's firing was an "injustice" based on his own suspicions about the Pendleton investigation. The reasonableness of Terri's concerns is strongly supported by the fact that Mr. Rowan shared them, and that Defendants' own investigator, Paul Charlton, affirmed them and the bases for them. [*Id.* ¶¶ 35-43.]

More importantly, Defendants have admitted that Terri's suspicions were objectively reasonable, based on what Terri knew, heard, observed, and read. [*Id.* ¶ 27.] In fact, their own investigator, Mr. Humphrey, wrote that in his report, suggesting that further inquiry could be made into the sources or reasons for her suspicions. [*Id.*] As Chief Brown testified, such suspicions if true (assuming *arguendo* that they were true) would be serious allegations of an unlawful police cover-up or conspiracy, *i.e.*, illegal activity. [*Id.* ¶¶ 29-30.] And that is exactly why Terri made the report to a friend of hers at the Maricopa County Attorney's Office, someone who she reasonably believed would help her to get the matter to be investigated by an "outside" agency. [*Id.* ¶¶ 9, 11, 14.]

Thus, there is no dispute of fact remaining on this element of Plaintiff's claim for the Court to consider at trial. Terri's disclosure of specific concerns about a police cover-up to a representative of the Maricopa County Attorney's Office was a "protected activity," having been based on her reasonable belief of illegal activity and disclosed to someone at the Maricopa County Attorney's Office that she reasonably believed could and would help her get the matter investigated by an outside agency. All other elements

12

of her claims present factual disputes that should be resolved by the fact finder at trial.

## III. CONCLUSION.

For the foregoing reasons and based upon the foregoing authorities, Plaintiff respectfully requests that the Court grant partial summary judgment in her favor with respect to the "protected activity" elements of her claims for whistleblowing and retaliation.

RESPECTFULLY SUBMITTED this 17th day of January, 2012.

**WARNOCK, MACKINLAY & CARMAN, PLLC**

By: s/ John T. White
Krista M. Carman
John T. White
246 South Cortez Street
Prescott, Arizona 86303
Attorneys for Plaintiff

13

**CERTIFICATE OF SERVICE**

I hereby certify that on the 17th day of January, 2012, I caused the foregoing document to be filed electronically with the Clerk of Court through ECF; and that ECF will send an e-notice of the electronic filing to:

The following ECF participants:

> Richard S. Cohen
> Stephanie M. Cerasano
> Sonya K. Boun
> JACKSON LEWIS LLP
> 2398 E. Camelback Road, Suite 1060
> Phoenix, Arizona 85016
> *Attorneys for Defendants*

By: s/ John T. White